UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DÉJEAN PIERCE | CIVIL ACTION |
| VERSUS | NO.  11-2893 |
| MARLON GUSMAN, DEPUTY LEE | UNITED STATES MAGISTRATE JUDGE KAREN WELLS ROBY |

### ORDER AND REASONS

This matter was before the Court for non-jury trial on October 22, 2012, upon consent of the parties pursuant to 28 U.S.C. § 636(c).[1]  The plaintiff, DéJean Pierce ("Pierce"), participated by conference telephone and the defendant, Orleans Parish Sheriff's Deputy Michael Lee and his counsel appeared in person in the Chambers of the undersigned Magistrate Judge.[2]  This matter involves the claims raised in Pierce's *pro se* and *in forma pauperis* petition filed pursuant to 42 U.S.C. § 1983 and, under a broad reading, Louisiana negligence law alleging that Deputy Michael Lee left his post and failed to provide him with protection from an attack by other inmates on November 20, 2010, while Pierce was housed in the Orleans Parish Prison ("OPP").[3]

---

[1]Rec. Doc. No. 14.

[2]Rec. Doc. Nos. 19, 20.  The trial testimony was taken down by a court reporter.

[3]Based on the prior orders of the Court, the only claim remaining are the failure to protect and negligence claims against Deputy Lee.  *See* Rec. Doc. Nos. 17, 18.

## I. Trial Testimony

### A. Testimony of the Plaintiff, DéJean Pierce

The Plaintiff, DéJean Pierce, testified that he was housed in a cell on the right side of tier C-2 in OPP on November 20, 2010. At that time, he was a pretrial detainee and had been on that tier for four days. He was convicted in July 25, 2011, on one count of second degree murder and one count of attempted second degree murder, for which he is serving concurrent sentences of life and 50 years.

On the date in concern, November 20, 2010, Deputy Lee was the only guard assigned to tier C-2. Pierce testified that, when he first arrived on the tier, he was given a knife by another inmate because he was being jumped and getting into fights. Pierce also was assigned to cell two. He stated that, because there were four other inmates in that cell, he moved himself to an empty bunk in cell three, where he was at the time of the incident.

Pierce recalled that just before the attack, the right side cells were unlocked and opened on his side because it was meal time. While the cells were open, an inmate identified as "Denzel" entered Pierce's cell and the two men got into an argument. Pierce could not recall what the argument was about. They then began to fist fight. In spite of his earlier statement, Pierce testified that, during the fist fight, an inmate from cell two handed him a knife to defend himself. At some point, two other inmates entered Pierce's cell to help Denzel. Another inmate, known as "Pimp," came into the cell and broke up the fight.

Pierce, at that time, left his cell and walked to the front window to find Deputy Lee to ask to be moved. He did not see Deputy Lee on the tier or through the window. Pierce testified that, just minutes before, Deputy Lee opened the cell doors and put the food tray on the tier for the tier

representative to pass out the meals. He then left the tier and closed the door. He believes that Deputy Lee left the tier to bring food to another tier. He claims that there was usually only one deputy to work two tiers.

When he did not see Deputy Lee, Pierce returned to his cell to check his black eye and pack his gear in hopes of being moved. As he entered his cell, he was stabbed in the back and attacked by several inmates, leaving him with 20 to 30 stab wounds. He was able to break free and run to the front of the tier. Deputy Lee immediately opened the tier door. Pierce stated that when he exited the tier, he was met by Lieutenant Washington, a ranking officer, who took him to the medical unit. Pierce later indicated that the first argument and fist fight with Denzel lasted about three minutes, and several minutes passed between the end of that fight and the stabbing incident.

Pierce stated that he was checked by the medical staff. The bleeding could not be stopped, and he was having trouble breathing. He was sent by ambulance to University Hospital. He was placed on a breathing tube, because both of his lungs had collapsed as a result of the stab wounds. He underwent an MRI and CTscan which showed cranial and nerve damage. It was four days before he could breathe on his own. About seven to nine days after his return, the numerous staples were removed from the wounds on his back. He was able to stop wound care in January of 2011.

When he was returned to OPP, he was placed on the medical tier from November 24, 2010 through May of 2011. Not long after his return, he also was interviewed about the incident by a Special Operations Division ("SOD") officer. Pierce did not know who had stabbed him since he was attacked from behind. As a result of the investigation, he was simply told that the deputy was on the tier.

Pierce testified that he now suffers with back pain. In addition, although he had mild asthma before, he is now required to use an asthma pump and to regularly take asthma medication for which he continues to seek care at his new facility.

In response to the defense counsel's questions, Pierce stated that he was attacked by Denzel and at least three other people, two of whom he saw wielding knives. Pierce conceded that he stated in his prior deposition that there were only two attackers.[4] He also recanted his testimony that he was given a "shank" or knife during his fight with Denzel, and admitted that he got the shank, made from a steel-toed boot, from another inmate when he first arrived on the tier. Pierce denied that he had made the shank himself. Pierce also did not tell Deputy Lee or any prison official that he had a shank. Pierce also testified that the inmates could not see directly into the deputy's desk area because of the "chicken wire" which obstructed the view. He asserted, however, that an inmate could sometimes tell if someone was there through the window in the dayroom.

Pierce also acknowledged that Lieutenant Washington, as a ranking officer, would have been on the tier to meet him only if he had been called to the tier by Deputy Lee. He thus conceded that Deputy Lee would have been on the tier to call for that assistance.

### B. Testimony of the Defendant, Deputy Michael Lee

The defendant, Deputy Lee, testified that he has been a deputy since 2007 and is post certified and trained in security at the academy. He stated that shakedowns, or cell searches, are randomly done by security officers about three times per month. These are done to secure the inmate areas from contraband and weapons.

---

[4]The deposition is marked as Defense Exhibit 1.

Deputy Lee did not know or recall that there were two incidents on November 20, 2010, involving Pierce. He testified that he was on the tier during his assigned shift on the date and time in question. He placed the inmates' food on the tier and called for the tier representative to pass it out. He went straight back to his desk. When he went to sit down, he could see that the inmates had begun moving to the back of the tier. He could not see a fight, but he called for back up. As he started to walk to the back, Pierce came to the front covered in blood. He opened the interlock gate and let Pierce off of the tier. By that time, Lieutenant Washington had arrived on the tier in response to his call and also was there to meet Pierce.

Deputy Lee further stated that the prison policy is for the tier deputy to call for backup and to wait for them to arrive before entering the tier. He called the command center and reached Deputy White to whom he reported that a fight was occurring. Deputy Lee stood by for back-up and, as Lieutenant Washington arrived, Pierce was coming to the front of the tier.[5] Pierce was taken by ambulance to the hospital.

Deputy Lee further explained that his desk is in front of the interlock where he can see straight down the tier. The interlock is a secured gated area between the cells and the deputy area. In addition, tier C-2 was the only tier he was working on that day. He also stated that the prison assigns a different deputy to every tier during each shift.

He also stated that prison policy does not allow him to leave a "rack-backed" tier, that is a tier where the cells are open. At the time, tier C-2 was racked-back on the right side for the noon meal. He also explained that there are cells on both sides of the tier, right and left. He can not open

---

[5]Although referred to as a lieutenant, this officer was Sergeant Dwayne Washington. His incident report is marked as Defense Exhibit 3.

both sides at the same time. From his desk, however, he could see both sides of the tier, although not directly into the cells. As a result, he would not have seen a fight if it took place in Pierce's cell.

Deputy Lee also testified that he had no indication that a fight was about to take place. Pierce did not tell the Deputy that he had a shank or report that anyone else had a shank. Pierce also did not report that he was in fear of a fight or for his safety. He also testified that the investigation into the attack on Pierce was conducted by Deputy Ernest Newman.[6] He did not know what happened to the other inmates, as the results of the investigation were not reported to him.

## II.     Findings of Fact and Conclusions of Law[7]

### A.     Fourteenth Amendment Standards

Pierce has argued that Deputy Lee was not at his post which resulted in the failure to protect him from the attack and/or stop the stabbing. Pretrial detainees, like Pierce, are protected by the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's cruel and unusual punishment standards. *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir.1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)); *Zara v. Strain*, 458 F. App'x 393, 393-94 (5th Cir. 2012). The distinction is primarily one of formality, however, because to determine whether a pretrial detainee's rights have been violated under the Fourteenth Amendment, the court applies an analysis identical to that applied in Eighth Amendment cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

Under these standards, prison officials have a duty to protect inmates from violence by other inmates and to take reasonable measures to protect their safety. *Farmer v. Brennan*, 511 U.S. 825,

---

[6] Deputy Newman's report is the inter-office memorandum marked as Defense Exhibit 2.

[7] To the extent the findings of fact are conclusions of law, and vice versa, they are deemed so and accepted.

832-33 (1994); *Hare*, 74 F.3d at 650.  However, not every injury "by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer*, 511 U.S. at 834.  "Prison officials are not . . . expected to prevent all inmate-on-inmate violence."  *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003) (citing *Farmer*, 511 U.S. at 834).  Instead, prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a known substantial risk of serious harm.  *Farmer*, 511 U.S. at 834; *Newton v. Black*, 133 F.3d 301, 308 (5th Cir. 1998).  The plaintiff, therefore, must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his safety or his need for protection.  *Neals v. Norwood,* 59 F.3d 530, 533 (5th Cir. 1995).

An official is deliberately indifferent to an inmate's health and safety "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847; *see Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999).  The United States Fifth Circuit has explained that "[d]eliberate indifference is a conscious choice to endanger constitutional rights."  *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008) (quotations omitted) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)).  Furthermore, "[d]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of harm."  *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).  Instead, "the officer must have the subjective intent to cause harm."  *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003).

**B.      Louisiana Negligence Standards**

While the Due Process Clause does not protect an inmate from negligence, such a claim can be found under state tort law. Broadly construing his complaint, the Court also will address Pierce's claims under Louisiana's law on negligence.

The fundamental principle of tort liability in Louisiana is that every act "of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315. Thus, in a negligence action under La. Civ. Code art. 2315 and La. Civ. Code art. 2316,[8] the plaintiff bears the burden of proving fault, causation and damages. *Cobena v. Metro Disposal, Inc.*, So.2d 126, 129 (La. App. 5th Cir. 2003) (citing *Wainwright v. Fontenot*, 774 So.2d 70 (La. 2000)).

Under La. Civ. Code art. 2316, negligence claims are examined by using a duty/risk analysis, wherein the plaintiff must prove each of the following elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element). *Hanks v. Entergy Corp.*, 944 So.2d 564, 579 (La. 2006). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. *Hyatt v. DDI Ventures, Inc.*, 843 So.2d 1242, 1244 (La. App. 3rd Cir. 2003) (citing *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318 (La. 1994)).

---

[8]La. Civ. Code art. 2316 provides: "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

Louisiana law states that prison authorities owe a duty of reasonable care to protect inmates from harm. *Hardy v. Foti*, 812 So.2d 792, 794 (La. App. 4th Cir. 2002); *Williams v. Kelone*, 560 So.2d 915, 916 (La. App. 1st Cir. 1990).

### C.  Discussion

The evidence and testimony presented at trial, including the post-trial submissions ordered by the Court, confirm that Pierce was brutally injured in an attack by other inmates on November 20, 2010. The medical records show that Pierce suffered facial trauma and between 15 and 23 stab wounds to his back.[9] He was transported by ambulance to the hospital accompanied by EMTs. He remained there until November 24, 2010 and received staples and bilateral chest tubes.[10] Upon his return to OPP, the staples were removed from his wounds on November 27, 2010.[11] He also received regular wound care and attention to the tube sites as ordered until January 25, 2011.[12] He also was seen and treated for his occasional complaints about his difficulty breathing.[13] After his transfer to Louisiana Department of Corrections facilities, he continued to seek and receive occasional treatment for back pain and effects from the bilateral lung punctures. His injuries and need for continued occasional medical care are not in question.

---

[9] Trial Exh. 3, Medical Records, Comment Entry/Inquiry (four pages), 11/20/10; Medical Routed Form, 11/20/10. The deputies reported that Pierce had 23 stab wounds to his back and a large knot under his left eye.

[10] Trial Exh. 3, Medical Records, Incarcerated Patient Discharge Summary, 11/24/10; Provider Note/Orders, 11/25/10.

[11] Trial Exh. 3, Medical Records, Wound Care, 11/25/10-12/2/10; Provider Note/Orders, 11/25/10.

[12] Trial Exh. 3, Medical Records, Wound Care, 11/25/10-12/2/10; Wound Care, 12/10 (5 pages); Wound Care, January 2011 (3 pages).

[13] *See e.g.*, Trial Exh. 3, Medical Records, DOC Records.

The matter at issue remains whether the attack was the result of Deputy Lee's negligent failure to protect or intentional indifference to a known risk of harm that Pierce would be attacked and stabbed by other inmates. A review of Pierce's testimony presents several points on which he relies to prove his case: (1) he procured a homemade knife or shank to protect himself because he kept getting into fights with other inmates; (2) on his fourth day on tier C-2, he had an argument and a brief fist fight with an inmate named Denzel while in cell three; (3) after another inmate intervened to end the fight, Pierce decided to request a transfer to another tier; (4) he went to the front of the tier and did not see Deputy Lee, although his view was obstructed by the chicken wire mesh; (5) he returned to his cell where he was attacked from behind by three to five inmates, two of which had knives; (6) he could not see who attacked him; (7) he did not report having a shank nor did he know the attack would happen. The credible testimony and the prison log books and records do not support the relevant portions of Pierce's testimony and instead establish the following facts.

The records show that Pierce was assigned to cell 2 on the right side of tier C-2 between November 17, 2010 and November 24, 2010.[14] An inmate named Denzel Lee also was assigned to cell 1, also on the right side of tier C-2 between November 17, 2010 and November 20, 2010.

The log book entries for tier C-2 does not contain an entry or any indication that Pierce was involved in any fights or altercations between November 17 and 19, 2010.[15] If Pierce was fighting with other inmates, it was not reported to or known by the guards on tier C-2. As Pierce concedes, he had a shank in his possession, and he did not report that he or any other inmates possessed a shank. There are no log entries reflecting that Pierce reported to the prison guards that he feared for

---

[14]Trial Exh. 1, Cell Assignments from November 17-24, 2010.

[15]Trial Exh. 2, Tier C-2 Log for 11/17-19/10.

10

his safety or anticipated being attacked at any time prior to November 20, 2010. Pierce also failed to testify that he made such a complaint or request for protection.

Pierce admittedly did not remain within the confines of his assigned cell and instead chose to spend time in cell three. Rather than seek protection, Pierce intentionally held an illegal weapon in the cell to be used in the event he became involved in a fight.

Although there is no confirming evidence of an initial argument, Pierce testified that, while in cell three on the morning of November 20, 2010, he got into an argument with Denzel Lee for reasons he could not recall. During this fist fight, Pierce used his shank to defend himself. The fight was broken up by another inmate. The fight occurred inside of the cell and outside of the visibility of Deputy Lee. Pierce concedes this point. Deputy Lee, was not on notice that Pierce and Denzel Lee had an on-going conflict that could have placed either inmate in danger.

Pierce claims that within a few minutes of the end of that fight, he went to the front of the tier to ask to be moved. He did not see Deputy Lee at his desk. A review of the log books for the three C block tiers, however, reflects that the arrival and departure of personnel is regularly entered. There is no entry on any of the log books to reflect that Deputy Lee left tier C-2 that morning.

Pierce claims that Deputy Lee most likely left the tier to bring food to the another tier, because the prison usually had one deputy working two tiers. The log books reflect that, on November 20, 2010, tier C-1 was manned during the day shift by Deputy Stanton, tier C-2 by Deputy Lee, and tier C-3 by Deputy Phillips.[16] The log books do not show that Deputy Lee went to or arrived on either tier C-1 or C-3 at any time on November 20, 2010.

---

[16]Trial Exh. 1, Tier C-1 Log, Tier C-2 Log, and Tier C-3 Log for 11/20/10.

Instead, the log books for tier C-1 recorded by Deputy Stanton indicate that he conducted a visual security check at 11:00 a.m. and that tier C-1 had ended its meal period by 11:19 a.m. This was before Deputy Lee indicated that tier C-2 began its meal period and before the time period during which Pierce claims that Deputy Lee was not at his post on tier C-2.

Similarly, the log books for tier C-3 bear an entry by Deputy Phillips at 11:05 memorializing the meal period there. This too was well before Deputy Lee began the meal service on tier C-2 and before the time period during which Pierce claims to have looked for Deputy Lee. Thus, contrary to Pierce's testimony, the prison log records clearly reflect that each tier had its own assigned deputy requiring that Deputy Lee left tier C-2 to tend to another tier.

The log entries for tier C-2 indicate that Deputy Lee made four visual security checks of the tier at 7:15 a.m., 8:15 a.m., 9:00 a.m., and 10:25 a.m. on the morning of November 20, 2010.[17] Deputy Lee also reported at 11:00 a.m. that a prison trustee brought utensils and water to Deputy Lee for the tier C-2 midday meal. Deputy Lee testified that he brought the food and utensils onto the tier to be passed out by the tier representative. These entries also belie Pierce's testimony that Deputy Lee left the tier to get the meal carts or left to provide food to another tier.

Deputy Lee testified that he brought the meals carts onto the tier, perhaps at the same time Pierce was looking for him at his desk. Upon his return to the desk, Deputy Lee began his next log entry at 11:23 a.m., which indicates that "feed up begins" and the entry appears to abruptly end. Pierce indicated that he was attacked during the meal period.

Consistent with the timing established by Pierce, Deputy Lee immediately returned to his desk after starting the right side meal period and saw what he believed to be a fight occurring at the

---

[17]Trial Exh. 1, Tier C-2 Log for 11/20/10.

back of the tier. His next entry at 11:30 a.m. indicates that he had already notified control that back up was needed due to an inmate fight. Another entry logged at 11:32 a.m. reports Sergeant Washington's arrival and escort of Pierce to the medical unit. It also contains a detailed account by Deputy Lee of the events consistent with his testimony at trial, indicating that he saw the crowd of inmates and one inmate on the ground indicating that a fight was occurring prompting him to call for assistance. He also wrote that he recognized inmate Joseph Narah in the fight.

The incident report prepared by Sergeant Washington indicates that two inmates, John Green and Joseph Norah were removed from tier C-2 for their involvement in the attack on Pierce.[18] The investigation disclosed that "inmates Denzel Lee and Dejean Pierce was [sic] involved in an [sic] physical altercation and inmate Joseph Norah jumped in to help inmate D. Lee."[19]

Another quite telling account of the events that occurred appears in Deputy Newman's report completed that same day:[20]

> Through the investigation it was learned from a Confidential Informant (C.I.) inmate Pierce was involved in a physical confrontation with inmate Denzel Lee . . . . The C.I. also stated he observed inmate Pierce with a homemade knife (shank) in his hand and had attempted to attack inmate Lee with it first. The C.I. stated inmate Joseph Norah then grabbed his own shank and began to attack inmate Pierce from the rear.

Deputy Newman also reported that Pierce was not cooperative with the investigation. The investigation report shows that Pierce was the aggressor in the fight with Denzel Lee that led to his stabbing. This adds additional question to the viability of Pierce's claim that he was returning to his cell after looking for Deputy Lee. That is, if he was the aggressor, armed with his shank, he

---

[18] Defense Exh. 3, Incident Report.

[19] *Id*.

[20] Defense Exh. 2, Inter-office Memorandum.

would not have been walking into his cell, unarmed to pack his things, and was not suddenly attacked.

Based on the foregoing, the credible testimony and evidence demonstrate that Deputy Lee was not made aware of a substantial risk that serious harm was about to come to Pierce. Pierce did not report any problems or impending dangers. He instead took it into his own hands to arm himself with a shank and may have been the aggressor in the fight that led to his injuries.

In addition, the evidence does not support his suggestion that Deputy Lee left the tier, and thus was not available to hear his request to be moved or to possibly respond to the attack faster than he did. Deputy Lee followed prison policy, designed for his own safety, by reporting the fight and waiting for back-up, who arrived with haste. Pierce himself indicates that the attack was quick and that both Deputy Lee and Sergeant Washington were at the entrance to the cell area to address the incident and get him medical care.

Other than Pierce's speculation, there is no evidence to establish that Deputy Lee left the tier, leaving him in danger and exposing him to a risk of harm either intentionally or through negligence. Pierce also has not shown that there was a substantial or pervasive risk of harm preceding the attack that should have placed Deputy Lee on notice of the impending attack. Simply put, Deputy Lee was not deliberately indifferent in failing to protect against a potential harm of which he was unaware. *Farmer*, 511 U.S. at 844.

Similarly, Pierce also has not shown that Deputy Lee acted with disregard to his duty to provide him with protection. Deputy Lee made regular visual security checks on the morning of November 20, 2010. He did not leave his post, and he had no apparent reason to believe that anyone

was in danger such to require him to act differently under the circumstances. There is no evidence to indicate that he breached the duty under Louisiana law to protect Pierce from harm.

Having failed to establish a violation of his rights under the Fourteenth Amendment, Eighth Amendment, or Louisiana law, Pierce is not entitled to relief from Deputy Lee for the injuries he received on November 20, 2010.

### III.   Conclusion

Accordingly, for the foregoing reasons derived from the testimony and evidence adduced at trial,

**IT IS ORDERED** that Pierce's claims against Deputy Michael Lee under 42 U.S.C. § 1983 for failure to protect and negligence claims under Louisiana tort law are **DISMISSED WITH PREJUDICE** as meritless and judgment will be entered accordingly.

New Orleans, Louisiana, this 7th day of March, 2013.

_____
**KAREN WELLS ROBY
UNITED STATES MAGISTRATE JUDGE**